```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
ZACHARY NERO, et al.,                   :
                                        :
                         Plaintiffs,    :    22cv1602 (DLC)
                                        :
            -v-                         :    OPINION AND
                                        :    ORDER
UPHOLD HQ INC.,                         :
                                        :
                         Defendant.     :
                                        :
--------------------------------------- X
```

APPEARANCES:

For plaintiffs and the proposed class:
Karl S. Kronenberger
Katherine E. Hollist
Leah Rosa Vulić
Kronenberger Rosenfeld, LLP
150 Post Street, Suite 520
San Francisco, CA 94108

For defendant:
Benjamin D. Bianco
Caitlin R. Trow
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, NY 10017

DENISE COTE, District Judge:

Plaintiffs bring claims on behalf of a putative nationwide class against defendant Uphold HQ Inc. ("Uphold"), a cryptocurrency exchange, for failing to implement adequate security protections for its accountholders.  In an Opinion of February 22, 2023 (the "Opinion"), this Court granted in part the defendants' motion to dismiss.  The sole remaining claims

are for violation of the Electronic Fund Transfer Act ("EFTA"),
and negligence per se premised on that violation.  Uphold now
moves for judgment on the pleadings as to the remaining claims.
Uphold's motion is granted in part.  The claim for actual
damages is dismissed.

## Background

I.   Factual Background

Familiarity with the Opinion is presumed.  See Rider v.
Uphold HQ Inc., No. 22cv1602 (DLC), 2023 WL 2163208 (S.D.N.Y.
Feb. 22, 2023).  Only those facts relevant to Uphold's motion
for judgment on the pleadings are summarized below; these facts
are undisputed or taken in the light most favorable to the
plaintiffs unless otherwise noted.

Uphold is a cryptocurrency exchange that enables users to
transfer, purchase, trade, hold, and sell cryptocurrencies on
its platform.  The plaintiffs are individuals who created
accounts on Uphold's website or in the Uphold mobile
application, and who subsequently had their Uphold accounts
accessed and drained by unauthorized users.  Uphold required
each accountholder to identify whether the person is creating an
"individual" or "business" account.  The plaintiffs each
identified their accounts as individual accounts.

2

The plaintiffs assert that Uphold violated the EFTA and failed to implement sufficient security protections for its customers, including protections required by the EFTA. Specifically, the plaintiffs allege that Uphold violated the EFTA by failing to: (1) provide disclosures to consumers clarifying consumers' liability under state and federal law for unauthorized electronic funds transfers at the time of account opening; (2) provide a telephone number and address for reporting unauthorized transfers; (3) properly identify individuals before issuing one-time passwords for the accounts; (4) require a written or telephonic request for issuance of a solicited access device; (5) timely conduct investigations; and (6) issue provisional credits and refunds.  Plaintiffs further allege that these failures allowed unauthorized users to access their Uphold accounts and engage in fraudulent transactions.

II.  Procedural History

Plaintiffs filed this lawsuit on February 25, 2022.  On July 11, plaintiffs filed their first amended complaint ("FAC"), asserting one federal cause of action and eight state law claims.  The action was reassigned to this Court on August 17. The defendants moved to dismiss the FAC on September 2.

The Court largely granted the defendants' motion to dismiss in its February 22, 2023 Opinion, including all claims against

the individual defendants.  See Rider, 2023 WL 2163208.  Only
the plaintiffs' claims against Uphold for violations of the EFTA
and for negligence per se predicated upon the same remained.
See id. at *9.  In its motion to dismiss the EFTA claim, Uphold
argued that the EFTA does not apply to cryptocurrency because
cryptocurrency does not constitute "funds" for purposes of the
EFTA.  Id. at *2.  The Opinion rejected that argument.  Id. at
*2-3.

In a letter dated April 25, Uphold informed the Court that
it planned to move for judgment on the pleadings to present
additional arguments for dismissal of the EFTA claim.  An Order
of April 27 allowed the plaintiffs to file a second amended
complaint ("SAC") but warned that the plaintiffs would be
unlikely to have a further opportunity to amend.  The plaintiffs
filed their SAC on May 12, 2023.

On May 26, Uphold filed its motion for judgment on the
pleadings pursuant to Fed. R. Civ. P. 12(c).  The motion became
fully submitted on June 16.  It again seeks dismissal of the
EFTA claim.

## Discussion

"The standard for granting a Rule 12(c) motion for judgment
on the pleadings is identical to that for granting a Rule
12(b)(6) motion for failure to state a claim."  Lively v. WAFRA

4

Investment Advisory Group, Inc., 6 F.4th 293, 301 (2d Cir. 2021)
(citation omitted).  To survive a motion to dismiss for failure
to state a claim, the complaint "must plead enough facts to
state a claim to relief that is plausible on its face." Green
v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076–77 (2d Cir. 2021)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." Charles v. Orange County, 925 F.3d 73, 81 (2d Cir.
2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).
"In determining if a claim is sufficiently plausible to
withstand dismissal," a court "accept[s] all factual allegations
as true" and "draw[s] all reasonable inferences in favor of the
plaintiffs." Melendez v. City of New York, 16 F.4th 992, 1010
(2d Cir. 2021) (citation omitted).  Nevertheless, a court is
"not required to credit conclusory allegations or legal
conclusions couched as factual allegations." Hamilton v.
Westchester County, 3 F.4th 86, 91 (2d Cir. 2021) (citation
omitted).

In its motion for judgment on the pleadings, Uphold argues
that: (1) the EFTA was not intended by Congress to apply to
cryptocurrency transactions, (2) the EFTA does not apply to

accounts established for individual investment purposes, and (3) plaintiffs have not adequately pled their EFTA claims.  These arguments require an examination of the statutory language.

"When interpreting a statute, [courts] begin with the plain language of the statute, giving the statutory terms their ordinary or natural meaning." Spadaro v. U.S. Customs & Border Protection, 978 F.3d 34, 46 (2d Cir. 2020) (citation omitted). "When that meaning is not clear, [courts] make use of a variety of interpretive tools, including canons, statutory structure, and legislative history." Id. (citation omitted).  When a term is not defined by statute, courts may "look to its ordinary meaning found in contemporary dictionary definitions," that is, in dictionaries that were available when the statute was enacted.  Mader v. Experian Info. Sols., Inc., 56 F.4th 264, 269 (2d Cir. 2023) (citation omitted).  Because the EFTA is a remedial consumer protection statute it is "read liberally to achieve [its] goals of protecting consumers." Curtis v. Propel Prop. Tax Funding, LLC, 915 F.3d 234, 239 (4th Cir. 2019) (citation omitted); see also Clemmer v. Key Bank Nat. Ass'n, 539 F.3d 349, 353 (6th Cir. 2008).

I.   An Overview of the EFTA

The EFTA was enacted in 1978.  In that era, emerging technologies included twenty-four-hour teller machines, direct

deposit of payroll and social security funds, and point-of-sale systems allowing a consumer to instantly transfer money from his or her bank account to a merchant.

In enacting the EFTA, Congress found that:

the use of electronic systems to transfer funds provides the potential for substantial benefits to consumers. However, due to the unique characteristics of such systems, the application of existing consumer protection legislation is unclear, leaving the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined.

15 U.S.C. § 1693(a).  Congress thus defined the purpose of the EFTA as follows: "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems."  Id. at § 1693(b).  Its "primary objective" was defined as "the provision of individual consumer rights."  Id.

As explained in the Senate Report that accompanied the creation of the Act, the Act was designed "to create rights for consumers in an era in which banking could be conducted almost exclusively through machines, the absence of personal contact being seen by Congress as a disadvantage making such an automated system much more vulnerable to fraud, embezzlement, and unauthorized use than traditional payment methods."  James Lockhart, J.D., Validity, Construction, and Application of Electronic Fund Transfer Act, and Regulations Promulgated

Thereunder, 15 U.S.C.A. §§ 1693 et seq., 46 A.L.R. Fed.2d 473 (2010) (citing Sen. Rep. No. 915, 95th Cong., 2d Sess. at 3 (1978) [hereinafter Senate Report]). Accordingly, Congress saw a need "to determine who should bear the loss for these unauthorized transfers." Kashanchi v. Texas Com. Med. Bank, N.A., 703 F.2d 936, 942 n.6 (5th Cir. 1983).

The EFTA conferred upon the Federal Reserve Board (the "Board"), and now the Consumer Financial Protection Bureau (the "CFPB"), the authority and responsibility to "prescribe regulations to carry out the purposes" of the Act. 15 U.S.C. § 1693b(a). The EFTA is implemented through Regulation E, codified at 12 C.F.R. § 1005[1], which includes not only the regulations but also official staff interpretations of those regulations ("Official Interpretations"). See 12 C.F.R. Pt. 1005, Supp. I.[2]

---

[1] Subpart A of Regulation E was originally adopted as 12 C.F.R. § 205 by the Board but, upon transfer of authority to the CFPB, was renumbered as 12 C.F.R. § 1005. See Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth In Lending Act (Regulation Z), 81 Fed. Reg. 83934, 83946 n.116 (Nov. 22, 2016).

[2] The Official Interpretations are "published in accordance with the broad powers that Congress delegated to the Board to fill gaps in the statute." Roberts v. Fleet Bank (R.I.), 342 F.3d 260, 265 (3d Cir. 2003), as amended (Oct. 21, 2003) (citation omitted). Requests for the issuance of Official Interpretations may be made directly to the CFPB. 12 C.F.R. § 1005 App. C.

The statute's regulations apply "to any <u>electronic fund
transfer</u> that authorizes a financial institution to debit or
credit a <u>consumer's account</u>."  12 C.F.R. § 1005.3(a) (emphasis
added).  The EFTA requires financial institutions to provide
regular disclosures to consumers in connection with their
accounts and defines how consumers can limit their liability in
the event there is an unauthorized electronic fund transfer from
their account.  Under the Act, consumers can challenge such
errors, have them corrected, and receive relief in the form of
financial penalties.  The Act provides for statutory damages as
well as actual damages "sustained by [a] consumer as a result
of" an institution's "failure" to comply with the Act.  15
U.S.C. § 1693m(a).

II.    Fiat Currencies and Cryptocurrencies

Uphold first argues that the EFTA was not designed to
regulate transfers of any currency other than fiat currencies,
that is, government-backed money such as the U.S. Dollar and
British Pound.  This argument fails.

The EFTA defines the term electronic fund transfer broadly.
There is no portion of that definition which would exclude
coverage of a transfer of cryptocurrency or which limits
coverage to fiat currency transfers.

An electronic fund transfer is defined as follows:  it "means any transfer of funds . . . which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account."  15 U.S.C. § 1693a(7).  It "includes, but is not limited to," point-of-sale transfers, ATM transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone.  Id.  Thus, the transfers regulated by the EFTA are not defined by the type of currency but by the medium of transfer.

In creating a non-exclusive list of methods of electronic transfer, Congress ensured that the definition of an electronic fund transfer was both broad and flexible.  "Aware that computer technology was still in a rapid, evolutionary stage of development, Congress was careful to permit coverage of electronic services not yet in existence."  Kashanchi, 703 F.2d at 939; see also Senate Report, at 4 (recognizing that "many people believe that EFT services may soon access other types of asset accounts.").  As the Senate Report notes, the broad definition of "electronic fund transfer" was intended to give the law's administrator "flexibility in determining whether new or developing electronic services should be covered by the [A]ct and, if so, to what extent."  Senate Report, at 9.

10

The fact that the statute was enacted before the creation of cryptocurrencies does not mean that it cannot apply to electronic transfers of cryptocurrencies.  "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."  Massachusetts v. E.P.A., 549 U.S. 497, 532 (2007) (finding the Clean Air Act's "sweeping definition of 'air pollutant'" includes greenhouse gasses (citing Pa. Dept. of Corr. v. Yeskey, 524 U.S. 206, 212 (1998) (applying the Americans with Disabilities Act's definition of "public entity" to state prisons))).

Despite the breadth of the EFTA's definition of the term electronic fund transfer, Uphold makes a series of arguments to support its position that electronic fund transfers of cryptocurrency are not regulated by the EFTA.  None of them succeeds.  First, Uphold points to four provisions of the statute that describe transactions that are specifically included and excluded.  It explains that these are transactions conducted in fiat currency and not cryptocurrency.  The included transactions to which it points are cash withdrawals from ATMs and point-of-sale debit card transactions.  15 U.S.C. § 1693a(7).  The excluded transactions are "any check guarantee or authorization service which does not directly result in a debit

or credit to a consumer's account" and "any transaction the primary purpose of which is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by" the SEC.  Id. at § 1693a(7)(A) and (C).

Uphold next finds support in the disclosure requirements imposed on financial institutions.  In two instances, those requirements refer to a "dollar amount."  For context, the EFTA requires the institution to disclose the terms and conditions of electronic fund transfers "at the time the consumer contracts for an electronic fund transfer service."  15 U.S.C. § 1693c(a).  The disclosure must include among other things "the type and nature of electronic fund transfers which the consumer may initiate, including any limitations on the frequency or dollar amount of such transfers."  Id. at (a)(3) (emphasis added).  Uphold points out that a model form created in connection with Regulation E directs consumers to report to financial institutions any suspected error in a "dollar amount."  12 C.F.R. Pt. 1005 App. A, Model Form A-3.

Finally, Uphold argues that the failure of either Congress, the Board, or the CFPB to explicitly extend the reach of the EFTA to cryptocurrencies is further evidence that it applies only to transfers of fiat currencies.  Uphold's arguments must be rejected.

The definition of "electronic fund transfer" contains no constraint that would limit the EFTA's coverage to fiat currencies.  As described above, the statute is written broadly. Its terms, when properly construed, cover the electronic transfer of funds such as cryptocurrency.  See Rider, 2023 WL 2163208, at *3.  The fact that Congress has not amended the EFTA to add an explicit reference to cryptocurrency does not alter the Court's duty to construe the statute as written.  Nor does it permit the Court to infer that Congress has restricted its application by implication.  Moreover, the agencies charged with administering the statute may not alter its clear terms.  As a consequence, their silence on the application of the EFTA to cryptocurrency transfers or their occasional reference in forms to dollar transactions do not affect the interpretation of the statutory language.[3]  After all, cryptocurrency, like foreign fiat currency, can be represented in a U.S. Dollar amount using the currency's exchange rate.

Finally, the four examples of transactions that are conducted in fiat currencies cannot impose by implication a limitation on the broad definition of an electronic fund

---

[3] In connection with the release of a 2016 rule, the CFPB expressly stated that it was taking no position with respect to the application of existing statutes, like the EFTA, to virtual currencies and services.  See Prepaid Accounts, 81 Fed. Reg. at 83978-79.

transfer.  To the contrary, these exclusions reflect that when Congress "wanted to limit a particular provision of the Act . . . it was perfectly capable of adding language to do so." Kashanchi, 703 F.2d at 939.  If Congress intended that the EFTA apply only to electronic fund transfers of fiat currencies it could have done so but did not.

III.  Purpose of the Account

Uphold next argues that, in restricting the protections provided by the EFTA in the case of unauthorized transfers to transfers from accounts established by consumers for "personal" purposes, Congress excluded from its application accounts which were established for investment purposes, that is, accounts established with a profit motive in mind.  This argument fails as well.  The EFTA's reference to "personal" accounts distinguishes between an account established for a natural person's own use, including for investments, and one established by a natural person for a separate entity, such as a business.

The EFTA defines an unauthorized electronic fund transfer as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer

14

receives no benefit." 15 U.S.C. § 1693a(12) (emphasis added).[4] The EFTA defines a "consumer" as a "natural person." <u>Id.</u> at § 1693a(6). "Account" is defined as:

> [A] demand deposit, savings deposit, or other <u>asset account</u> (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(i)[1] of this title), as described in regulations of the Bureau, <u>established primarily for personal, family, or household purposes</u>, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement[.]

<u>Id.</u> at § 1693a(2) (emphasis added).

Thus, the EFTA applies to any asset account established by a natural person primarily for personal, family, or household purposes. The EFTA does not define the phrase "personal, family, or household purposes."

The Senate Report states that "[e]xamples of asset accounts which would be covered are money market mutual fund accounts and positive balances in margin accounts at a stock brokerage." Senate Report, at 9. The Report adds that the definition of "account" is "deliberately broad so as to assure that all persons who offer equivalent EFT services involving any type of asset account are subject to the same standards and consumers owning such accounts are assured of uniform protection." <u>Id.</u>

---

[4] The statutory definition excludes, among other things, transfers by a person who was furnished with access to the account by the consumer. 15 U.S.C. § 1693a(12).

According to the Report, this broad definition supports the "principal purpose" of the Act, which is "the creation of substantive consumer rights." Id. at 3.

The CFPB provides little color on this definition in its Official Interpretations. It states only that the term "consumer asset account" includes "[c]lub accounts, such as vacation clubs" and "a retail repurchase agreement" but does not include:

> i. Profit-sharing and pension accounts established under a trust agreement, which are exempt under § 1005.2(b)(2).
>
> ii. Escrow accounts, such as those established to ensure payment of items such as real estate taxes, insurance premiums, or completion of repairs or improvements.
>
> iii. Accounts for accumulating funds to purchase U.S. savings bonds.

12 C.F.R. Pt. 1005, Supp. I, ¶2(b) cmt. 1-2.

As relevant here, the EFTA applies to an asset account established by a natural person, when that account was established "primarily" for "personal" purposes. At the time the EFTA was enacted, 1978, Black's Law Dictionary defined "personal" as "appertaining to the person; belonging to an individual." Personal, Black's Law Dictionary (Rev. 4th ed. 1968); see also Personal, Black's Law Dictionary (5th ed. 1979). Under its plain meaning, therefore, an account is established

primarily for a personal purpose where the natural person established the account for their individual or family use, as opposed to for a business or commercial endeavor. Courts in this district have adopted a similar distinction. See, e.g., Fischer & Mandell LLP v. Citibank, N.A., No. 09cv1160 (RJS), 2009 WL 1767621, at *3 (S.D.N.Y. June 22, 2009) ("[T]he EFTA does not apply to accounts that are used primarily or solely for commercial purposes"); Regatos v. North Fork Bank, 257 F. Supp. 2d 632, 638 n.10 (S.D.N.Y. 2003) (noting that because "the purpose of the account in question was purely commercial," the EFTA was inapplicable). Under this definition, any profit motive in establishing the asset account is irrelevant.

This construction of the phrase "personal purpose" as including asset accounts established as investment accounts is reinforced by another provision in the Act. Under the definition of "electronic fund transfer," the statute exempts "any transaction the primary purpose of which is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by the [SEC]." 15 U.S.C. § 1693a(7)(C) (emphasis added). Only the transactions involving the purchase and sale of regulated securities are excluded; the asset accounts holding those investments are not excluded. Therefore, personal asset accounts that are investment accounts

like the money market mutual fund accounts identified in the
Senate Report or the cryptocurrency accounts at issue here, are
accounts covered by the EFTA.  This is true even though a
transaction from those accounts may not be subject to the EFTA
in the event it is a transaction for the purchase or sale of a
security regulated by the SEC.  See 12 C.F.R. § 1005.3(c)(4)(i).

Uphold relies on the use of the phrase "personal, family or
household purposes" in two other contexts to support its
argument that a profit motive test should be applied to the
EFTA.  The "profit motive" test Uphold urges the Court to import
is used in connection with the Truth in Lending Act ("TILA") and
in bankruptcy law to distinguish between personal and business
transactions.  Neither usage, however, suggests that a profit
motive test is helpful in deciding whether an asset account was
primarily established for a personal as opposed to a business
purpose when applying the EFTA.

The purpose of TILA is "to assure a meaningful disclosure
of credit terms" in order to improve consumer decision-making
and "to protect the consumer against inaccurate and unfair"
credit practices.  15 U.S.C. § 1601(a).  The TILA does not apply
to credit extended primarily for "business" or "commercial"
purposes.  Id. at § 1603(1).  Thus, like the EFTA, the TILA is
intended to benefit individual consumers.  But the TILA

regulates disclosure in the context of a consumer's personal credit transaction, while the EFTA regulates disclosure in the context of an individual's personal asset account.

The TILA requires disclosures to be made in connection with the issuance of "consumer credit" and defines that term as "credit offered or extended to a consumer primarily for personal, family, or household purposes." 12 C.F.R. § 1026.2(a)(12) (emphasis added). The CFPB's comment to § 1026.2 -- TILA's definitions and rules clause -- states:

> There is no precise test for what constitutes credit offered or extended for personal, family, or household purposes, nor for what constitutes the primary purpose. (See, however, the discussion of business purposes in the commentary to § 1026.3(a).)

12 C.F.R. Pt. 1026, Supp. I, cmt. 2(a)(12). The commentary acknowledges that credit extended to finance an acquisition of securities and other assets such as art and antiques may be made for either a personal or a business purpose and suggests five factors to consider in identifying the primary purpose of the acquisition. Id. at cmt. 3(a)(3). The existence of a profit motive is not among the five. Id. at cmt. 3(a)(3)(i).

In certain circumstances, courts have found it helpful to identify whether a loan was obtained primarily for a personal purpose as opposed to a business purpose by investigating whether the loan had a profit motive. One court summarized the

19

relevant precedent as indicating that, "[a]s a general matter, when a party obtains a loan in order to make a profit, that loan is not considered a 'personal' loan under TILA." Mauro v. Countrywide Home Loans, Inc., 727 F. Supp. 2d 145, 154 (E.D.N.Y. 2010) (finding TILA inapplicable to a loan obtained in order to invest in rental properties). None of the cited cases, however, applies a profit motive test to determine whether the financing of the purchase of securities held in an individual account is a transaction covered by TILA.[5]

Even if it may be helpful, when applying TILA, to use a profit motive test when examining whether a certain type of credit transaction has a personal or business purpose, that test is not helpful when examining whether an asset account was established for a personal or business purpose. As explained above, an asset account covered by the EFTA may be an account holding investments from which the individual hopes to gain a profit for herself or her family.

Uphold's reliance on bankruptcy law is no more successful. When identifying consumer debt in the bankruptcy context, courts look "to the purpose for which the debt was incurred to determine whether debt is for 'personal, family, or household

---

[5] TILA exempts from its coverage transactions in securities or commodities accounts by a broker-dealer registered with the SEC. 15 U.S.C. § 1603(2).

purposes.'" Curtis v. Propel Prop. Tax Funding, LLC, 915 F.3d 234, 245-46 (4th Cir. 2019) (citation omitted). In bankruptcy jurisprudence, "a debt that was not incurred with a profit motive or in connection with a business transaction is considered 'consumer debt.'" Id. at 246 (citation omitted). Again, as was true for the TILA, the "profit motive" test may be used to distinguish a business or commercial transaction on the one hand from a personal or consumer loan on the other. The EFTA, however, does not apply to unique transactions but to asset accounts. It defines "account" only by means of the purpose for which the account is "established." 15 U.S.C. § 1693a(2). Accordingly, the EFTA covers an account established for an individual's personal use, even when that individual uses the account for investment or profit-making purposes.

Finally, the defendant relies on two district court cases to support its contention that an EFTA-regulated asset account cannot be established with investment funds. In Cobb v. Monarch Fin. Corp., 913 F. Supp. 1164 (N.D. Ill. 1995), the court denied a motion to dismiss an EFTA claim, holding that the accounts were established for a personal purpose. Id. at 1174-75. The accounts received direct deposits of the individual's paychecks and their funds paid off consumer debt. Id. at 1175. While the court referred to a TILA "profit motive" test, that discussion

was dicta and in any event of little relevance to the claims at issue here.  Id. at 1174-75.

Far more relevant is the supplemental authority which Uphold supplied on August 16, 2023.  Relying on the shared legislative origin of the EFTA and TILA, and their parallel usage of the phrase "personal, family, or household purpose" to distinguish between consumer and business accounts (EFTA) or transactions (TILA), the Honorable Lewis Liman adopted what he found to be profit motive test in TILA and held that the EFTA is inapplicable to a cryptocurrency account at Uphold.  Bruce Yuille v. Uphold HQ Inc., No. 22cv7453 (LJL), 2023 WL 5206888, *8 (S.D.N.Y. Aug. 11, 2023).  Respectfully, and for the reasons already explained, this Court declines to adopt a profit motive test to determine whether an asset account was established primarily for a personal or commercial purpose.

Yuille relied on several cases distinguishing between personal and business credit transactions either in the context of a TILA or a bankruptcy claim.  Each of the cases referred to a profit motive test in a very different context from the one at issue here.  None of the cases considered whether a transaction entered in connection with a personal account holding investments funds should be considered a personal or business transaction for purposes of TILA.  As already noted, credit

22

transactions used to fund the purchase of securities may be covered by TILA.  See 12 C.F.R. Pt. 1026, Supp. I, cmt. 3(a)(3).

A description of the first case cited in Yuille will suffice to demonstrate that the contexts in which courts have found it useful to apply a profit motive test are easily distinguishable.  In Mauro, 727 F. Supp. 2d 145, the court granted summary judgment for the defendants on a TILA claim, finding that the loans obtained to invest in non-owner occupied rental properties were obtained for a business purpose.  Id. at 154.  As the court recognized, the Official Staff Commentary to TILA explains that credit extended for such a purpose is deemed a business purpose.  Id.  While the court remarked that "[a]s a general matter, when a party obtains a loan in order to make a profit, that loan is not considered a 'personal' loan under TILA," the court's analysis did not rest on that test.  Id. Instead, the court began by acknowledging that it must look at the entire transaction to determine whether it was entered for a personal or commercial purpose, and then considered the five factors identified in the Official Staff Commentary to the TILA, none of which refers to a profit motive test.  Id. at 153.

In sum, while a key distinction for both the EFTA and TILA is whether the account or transaction is intended for a personal purpose as opposed to a commercial or business purpose, the

23

tests used to make that distinction in one context may not be useful in every context.  The profit motive test has little or no utility here because the SAC plausibly alleges that the asset accounts were established primarily for a personal and not a business purpose.

IV.  Causation and Actual Damages

Uphold contends that the plaintiffs have failed in two ways to plead that their accounts are covered by the EFTA.  It asserts that the SAC does not adequately plead that the accounts were established for a non-investment purpose.  This argument rests on Uphold's misreading of the EFTA and is denied.

Uphold also asserts that the SAC fails to allege that the alleged violations of the EFTA caused damage to the named plaintiffs.  As a consequence, Uphold moves to strike any demand for actual damages.  That request is granted.

The EFTA permits a consumer to recover actual damages, statutory damages,[6] costs and reasonable attorney fees.  See 15 U.S.C. § 1693m(a).  As for actual damages, the EFTA provides that a plaintiff may recover "any actual damage sustained by

---

[6] Statutory damages for a class action are capped at "the lesser of $500,000 or 1 per centum of the net worth of the defendant." 15 U.S.C. § 1693m(a)(2)(B).

such consumer as a result of [the defendant's] failure" to comply with EFTA.  Id. at § 1693m(a)(1).

To establish actual damages under the EFTA, "a plaintiff must show that the claimed actual damages were 'as a result of' the violation, that is, he must show a causal connection between the EFTA violation and the claimed actual damages." Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1026 (9th Cir. 2011), abrogated on other grounds by Comcast Corp. v. Behrend, 569 U.S. 27 (2013).[7]  The Ninth Circuit has held that a claim for actual damages under the EFTA "would at least require the establishment of a substantial nexus between the injury and the statutory violation." Id. (citation omitted); see also Brown v. Gardner, 513 U.S. 115, 119 (1994) ("[A]s a result of" language imposes a causal connection between injury and treatment).

The Second Circuit has not articulated a standard governing causation for actual damages under the EFTA.  The Supreme Court approved the "substantial nexus" test when it construed the statutory term "as the result of" in the Outer Continental Shelf Lands Act ("OCSLA").  See Pac. Operators Offshore, LLP v. Valladolid, 565 U.S. 207 (2012).  The OCSLA extends the federal workers' compensation scheme established in the Longshore and

---

[7] Where EFTA's disclosure provisions are at issue, courts have required a plaintiff to show detrimental reliance.  See, e.g., Vallies v. Sky Bank, 591 F.3d 152, 161 (3d Cir. 2009).

Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., to injuries "occurring as the result of operations conducted on the outer Continental Shelf" for the purpose of extracting natural resources from the shelf.  43 U.S.C. § 1333(b) (emphasis added). The Court explained that a plaintiff attempting to prove a "substantial nexus" between the violation and their injury must show more than "but-for" causation; courts should only focus on injuries that have a "significant causal link" to the defendant's conduct.  Id. at 221-22.  Accordingly, to recover actual damages under the EFTA, the plaintiffs must first establish that there is a substantial nexus between the violation and the loss.[8]

The six alleged violations of the EFTA described in the SAC are recited above.  In opposing this motion, the plaintiffs rely on three of the alleged violations to plead causation: that Uphold issued one-time passwords ("OTPs") without obtaining the requisite written or telephonic request, failed to issue credits or refunds, and failed to provide the required telephone number. While the SAC does not identify the specific provisions of the

---

[8] The parties have not addressed the standard for causation under the EFTA.  Should this case proceed to summary judgment or trial, they shall be given an opportunity to address whether the standard is the substantial nexus test or the more common proximate cause standard.  See Pac. Operators Offshore, 565 U.S. at 223 (Scalia, J., and Alito, J., concurring).

EFTA in which these duties can be found, this Opinion has attempted to do so and each of them is addressed next.  In each instance, the SAC fails to plausibly plead a violation, causation, or both.

A.   Issuance of OTPs

The SAC alleges that Uphold issued OTPs to unauthorized users without obtaining a written or telephonic request required by the EFTA, and that the unauthorized users thereafter accessed and drained the plaintiffs' accounts.  The SAC alleges as well, however, that Uphold issued OTPs to the unauthorized users after those individuals entered the email address and the password for the plaintiff's Uphold account and then clicked a link to request an OTP.

An OTP is an "access device."  An access device is defined by Regulation E as "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers."  12 C.F.R. § 1005.2(a)(1).  Regulation E permits a financial institution to issue an access device to a consumer only:

(1) In response to an oral or written request for the device; or

(2) As a renewal of, or in substitution for, an accepted access device whether issued by the institution or a successor.

Id. at § 1005.5(a).

27

The SAC has not pleaded that Uphold provided access to the plaintiffs' accounts without requiring a written or telephonic request for an OTP.  To the contrary, the SAC pleads that the wrongdoers used the plaintiffs' email addresses and passwords for their Uphold accounts to make a written request for the OTP they used to empty the plaintiffs' accounts.  Since the SAC has failed to plead a violation of 12 C.F.R. § 1005.5(a), it is unnecessary to address the issue of causation.

B.   Provisional Credit

The plaintiffs next argue that they were damaged because Uphold failed to provisionally credit their accounts for the amount of the stolen funds.  The SAC fails to plead that Uphold breached the EFTA by failing to provisionally credit their accounts.  It also fails to plead that the absence of a provisional credit or refund was a cause of their losses.[9]

Under the EFTA, financial institutions have the option of providing consumers with a provisional credit to their accounts while the institution conducts investigations of reported "errors."  Errors are defined to include unauthorized fund transfers, 15 U.S.C. § 1693f(f)(1), and § 1693f outlines

---

[9] In opposition to this motion to dismiss, the plaintiffs argue that they are seeking consequential damages due to the failure to provisionally credit their accounts.  That theory of damages is not pleaded in the SAC and will not be further addressed.

investigative procedures that financial institutions must follow to resolve errors.

Section 1693f requires that a financial institution, within ten business days of receipt of notice of an error, investigate the error and report the result of its investigation to the consumer.  See 15 U.S.C. § 1693f(a).  Alternatively, the institution may, within ten business days, provisionally credit the consumer's account in the amount of the alleged error pending the conclusion of its investigation, provided that the investigation is concluded within forty-five days of the receipt of notice of the error.  Id. at § 1693f(c).

The investigation need involve no more than a review of the institution's own records.  A financial institution's "review of its own records regarding an alleged error" satisfies the investigation requirement if "(i) [t]he alleged error concerns a transfer to or from a third party; and (ii) [t]here is no agreement between the institution and the third party for the type of electronic fund transfer involved."  12 C.F.R. § 1005.11(c)(4).

The allegations in the SAC regarding provisional credits are sparse.  Consider the following:

- Plaintiff Nero "relentlessly contacted Uphold," and they replied after three months that they "could not help him."

29

- Uphold advised plaintiff Maloupis it "could not help him" and told him to contact local law enforcement.

- Uphold denied "all fault in the theft of [plaintiff] Smith's $12,000 in cryptocurrency, without any explanation," and did not issue a provisional credit or refund.

- Plaintiff Boevi alleged that Uphold's support team "claimed to conduct an internal investigation, in which it concluded it was in no way responsible for the loss."

- Uphold denied all responsibility for the unauthorized transfer in plaintiff Ramirez's account, and stated "someone had gained access to Ramirez's Authenticator app."

The SAC fails to allege that Uphold had any obligation to provisionally credit any of the plaintiffs' accounts. It does not assert that Uphold failed to complete the investigations required by the EFTA within ten days of the reports of loss and report its conclusions to the plaintiffs.

Moreover, the SAC fails to plead that any failure to provide a provisional credit caused the plaintiffs' losses. The losses necessarily occurred before Uphold was notified by the plaintiffs of the unauthorized transfers. The SAC fails to plead that the absence of a provisional credit had any causal nexus to the thefts, much less a significant one.

C.   Telephone Number

Finally, the SAC asserts that Uphold's failure to provide the plaintiffs with a telephone number, as required by the EFTA, prevented the plaintiffs from stopping unauthorized users from

draining their funds.  While the SAC adequately pleads that Uphold failed to provide consumers with a telephone number, it does not plead that the EFTA violation caused any of the plaintiffs' alleged losses.

At the time a consumer contracts for an electronic fund transfer service or before the first electronic fund transfer from the consumer's account, a financial institution is required by the EFTA to provide "[t]he telephone number and address of the person or office to be notified when the consumer believes that an unauthorized electronic fund transfer has been or may be made."  12 C.F.R. § 1005.7(b)(2).  The SAC pleads that Uphold failed to provide the plaintiffs with a telephone number. Instead, as described in the SAC, Uphold provided account holders with an online chat option and a customer support email address.  The SAC pleads that the plaintiffs used both means to contact Uphold regarding the thefts.

In connection with four of the five plaintiffs, there is no allegation that the inability to telephone Uphold had any connection to the damages alleged here.  According to the SAC, plaintiffs Smith, Maloupis, Nero, and Ramirez each opened their accounts to find them either largely or entirely empty.  Each of these plaintiffs alleges that he "immediately" contacted Uphold

customer support upon discovering the empty accounts.[10] Plaintiffs Smith, Maloupis, Nero, and Ramirez have therefore failed to allege a causal link between the draining of their cryptocurrency accounts and Uphold's failure to provide them with a telephone number.

Plaintiff Boevi, the fifth plaintiff, has also failed to plead a causal connection between the theft of his funds and the alleged EFTA violation. The SAC asserts that Boevi received an email notification from Uphold about a transfer or transfers from his account.[11] Boevi had not initiated the transaction, and "immediately contacted Uphold's support team to notify them that an unauthorized user had gained access to his account." Uphold "acknowledge[ed] Boevi's messages" but did not immediately freeze his account to prevent further transactions. The unauthorized user continued to transfer money out of the account for two hours and eleven minutes after Boevi notified Uphold. Eleven minutes after his account was emptied, Uphold froze

---

[10] The SAC alleges that Uphold responded differently to each plaintiff. Uphold froze Smith's account four hours after he emailed support; Uphold advised Maloupis they could not help him and instructed him to contact local law enforcement; Uphold replied to Nero three months later that it "could not help him and that he should contact local law enforcement;" and Uphold replied to Ramirez by denying all responsibility.

[11] The SAC does not specify how many unauthorized transfers occurred out of Boevi's account or the value of each transfer.

Boevi's account.  The SAC asserts that "[h]ad Uphold provided a
phone number, Boevi would have been able to report this
fraudulent activity for immediate or near-immediate resolution."

The SAC does not plausibly allege that Boevi's inability to
place a telephone call to Uphold was the cause of the thefts
from his account.  Moreover, the SAC asserts that Boevi was able
to contact Uphold "immediately," and it "acknowledged" his
message.

The plaintiffs appear to misapprehend the extent of
protection provided by the EFTA.  It does not require an
institution to immediately freeze an account upon receiving a
consumer's report of an unauthorized transfer.  Nor does it
require the institution to investigate a report of a theft of
funds within a matter of minutes or hours.  Section 1005.7 does
not even require that an institution employ human beings to
personally and promptly answer each telephone call.  The
provision on which the plaintiffs rely is a disclosure
provision, intended to provide consumers with a means to contact
the financial institution to report an error.  The theft of
plaintiff Boevi's cryptocurrency was not "a result of" Uphold's
failure to provide him with that telephone number.

## Conclusion

Uphold's May 26, 2023, motion for judgment on the pleadings
is granted in part.  The plaintiffs' demand for actual damages
is stricken.  The motion is otherwise denied.

Dated:    New York, New York
          August 23, 2023

                                        DENISE COTE
                            United States District Judge

34